IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW FULLMAN, | : | CIVIL ACTION |
| | : | NO. 10-1536 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    December 20, 2016


Plaintiff Andrew Fullman ("Plaintiff" or "Fullman"), a
disabled African American, brings this action against Defendants
City of Philadelphia ("the City"), Police Officer Terrance
Lynch, Police Officer Jared Krzywicki, Police Lieutenant Stephen
Cassidy, Police Officer Rasheen Dickerson,[1] Police Officer
Mitchell,[2] and Police Officer John Doe (collectively,
"Defendants"), asserting civil rights violations for three
separate series of incidents.

Before the Court is Defendants' renewed motion for
summary judgment on all claims against all Defendants, which

---

[1]     Plaintiff named an Officer "Dickinson" with Badge No.
6434 in his original complaint, and he continues to use this
name even in his most recent filings--but Defendants have
clarified that this officer's last name is actually "Dickerson."
Defs.' Renewed Mot. Summ. J. at 2 n.1, ECF No. 80.

[2]     Neither of the parties identify Police Officer
Mitchell's first name.

Plaintiff has opposed. For the reasons that follow, the Court will grant Defendants' motion for summary judgment in full.

## I.    **FACTUAL BACKGROUND**

### A.    June 13, 2006 Incident[3]

The first incident at issue in this case occurred on June 13, 2006, while Police Officer Terrence Lynch ("Officer Lynch") was patrolling the area around the Roosevelt Mall. See Third Am. Compl. ¶ 10 ("TAC"), ECF No. 77; Pl.'s Resp. Ex. 1 at 1, ECF No. 81-3. On that afternoon, Plaintiff drove his car to the post office in that area, intending to park in one of the handicap spots nearby, Fullman Dep. at 9:21-24, Dec. 9, 2008, ECF No. 70-3 [hereinafter Fullman 2008 Dep.]. All of the handicap spots, however, were occupied at that time, id. at 10:15-16, and Plaintiff noted that one car parked in a handicap spot did not have a handicap tag, id. at 9:21-24.

Plaintiff then parked his car in the fire lane. Id. at 11:1-2. Two other cars, both of which Plaintiff noted were occupied, were also parked in the fire lane at that time. Id. at 11:23-12:8. Plaintiff then got out of his car and approached Officer Lynch to report the car parked in a handicap spot without a handicap tag. Id. at 10:22-11:2. After Plaintiff told

---

[3]     The facts alleged here were first brought in an earlier case, Civil Action No. 08-2781, which the Court later consolidated with the instant action. See Order dated June 11, 2014, ECF No. 48.

2

Officer Lynch that he was parked in the fire lane and Officer Lynch asked Plaintiff to move his car, the two began to argue. See id. at 11:1-2, 12:11-14; see also Pl.'s Resp. Ex. 1 at 1. Plaintiff claims that "[Officer Lynch] kind of got an attitude and I got an attitude back with him and the argument started," id. at 13:6-9, which included the use of profanities by both parties, id. at 13:15-16 ("I told him he didn't have to curse at me, so I started cursing back.").

At that time, Plaintiff's pitbull, which he had left in his car, began to "go[] crazy." Id. at 13:18-24; see also Pl's Ex. 1 at 2. Plaintiff then walked away from Officer Lynch to get back into his car. See Fullman 2008 Dep. at 14:1-20. While Plaintiff was sitting in his car, Officer Lynch grabbed him and pulled him out of the car by his left arm. Id. at 14:17-20, 15:16-21. Officer Lynch then threw Plaintiff against the car and kicked his legs open in order to frisk him. Id. at 17:1-15. While placing handcuffs on Plaintiff, Officer Lynch twisted or bent back Plaintiff's left thumb. Id.; see also id. at 18:12-14. Officer Lynch then arrested Plaintiff for disorderly conduct and ticketed him for parking in the fire lane. See Pl.'s Resp. Ex. 1 at 1.

While Plaintiff was waiting in Officer Lynch's patrol car, several other officers reported to the scene.[4] Fullman 2008 Dep. at 19:1-7. One of those officers asked Plaintiff if he had any health conditions, and Plaintiff disclosed that he was diabetic. Id. at 19:11-15, 19:20-20:1. Plaintiff was also wearing a diabetic bracelet at the time of the incident. Id. at 19:14-15. Thereafter, the officers joked about Plaintiff being diabetic. Id. at 19:1-7. One officer said that Plaintiff "may be a little hyper because maybe his sugar is high." Id. at 19:11-12.

After several minutes of waiting in the patrol car, Plaintiff was driven to police headquarters for processing, and after spending an additional twenty to thirty minutes at the police station, he was released. Id. at 20:9-20. Plaintiff was charged with disorderly conduct, see Pl.'s Resp. Ex. 1 at 1, and the police contacted the Philadelphia Animal Care and Control Association to take custody of Plaintiff's pitbull. Pl.'s Opp. Ex. 1 at 2.

Later that evening, Plaintiff went to Nazareth Hospital complaining of back and left thumb pain. Fullman 2008 Dep. at 22:6-9. He was diagnosed with a sprained back and thumb and prescribed several painkillers, including codeine, propoxyphene, hydrocodone, and oxycodone. See Pl.'s Resp. Ex. 1

---

[4]     Plaintiff has not identified any of these officers.

4

at 3-5. Several days later, on June 19, 2006, Plaintiff followed up with his primary care physician, who made the same diagnoses as the doctors at Nazareth Hospital. Fullman 2008 Dep. at 23:13-18. Plaintiff received medical treatment and physical therapy for several weeks thereafter, id. at 23:19-23, and he stated during his 2008 deposition that he was still experiencing back and thumb pain at that time, id. at 24:8-10. During his 2011 deposition, Plaintiff added that he wore a splint on his thumb for two weeks following the incident. Fullman Dep. at 63:8-12, June 22, 2011, ECF No. 70-4 [hereinafter Fullman 2011 Dep.].

        In support of his allegations that the arrest was based on a discriminatory or retaliatory motive, Plaintiff stated as follows:

> [M]y handicap tags were visible to [Officer Lynch] because he was behind me. And that should have signified, you know, that that's someone that has a disability. And by me being African American in a Buick with tinted windows, I believe kind of motivated, and having handicap tags motivated his action.

Fullman 2008 Dep. at 38:17-22.

        After Officer Lynch failed to appear at a hearing scheduled for May 31, 2007, and continued to July 19, 2007, the disorderly conduct charges against Plaintiff were dismissed for lack of prosecution. Id. at 21:2-18. Plaintiff reported the incident to the Internal Affairs Division of the Philadelphia Police Department (the "Internal Affairs Division" or "Internal

5

Affairs"), see Pl.'s Resp. Ex. 2, ECF No. 81-4, but the parties have not provided any evidence showing whether or how that report was handled, investigated, or resolved.

B.   Incidents between March 23, 2005, and February 16, 2009

Plaintiff next alleges that, throughout a series of incidents that occurred between 2005 and 2009, the Philadelphia Police Department displayed a pattern of hostility and retaliated against him for filing numerous incident reports with the Internal Affairs Division.[5]

---

[5]     The facts alleged in connection with these incidents were first brought in an earlier case, Civil Action No. 09-3559, which the Court consolidated with the present action. See Order dated June 11, 2014, ECF No. 48. The specific incidents alleged included the following:

- On March 23, 2005, non-defendant Officer Perkins "informed [Plaintiff] that he was being issued a citation for illegal window tinting but was instead issued a citation for obstructing of a windshield," TAC ¶ 22, ECF No. 77;
- In early April 2005, non-defendant Officer Williams stopped Plaintiff for illegal window tinting, and three weeks later, he stopped Plaintiff again for rolling through a stop sign, id. at ¶ 23;
- On January 12, 2006, non-defendant Officer Martex stopped Plaintiff for illegal window tinting and made offensive race-related comments, id. at ¶ 24;
- On June 27, 2006, non-defendant Officer McMichael deliberately obstructed two handicapped parking spaces and made offensive comments regarding Plaintiff, id. at ¶ 25;
- On August 23, 2006, an unnamed police officer improperly questioned Plaintiff regarding his disability, id. at ¶ 26;
- On November 17, 2006, unnamed police officers followed Plaintiff's vehicle and nearly caused a collision, id. at ¶ 27;

6

At this point in the proceedings, the only claims remaining from Plaintiff's 2009 action are those against Officer Mitchell arising from an incident that began on May 16, 2008, while Plaintiff was driving south on 57th Street in Philadelphia. Fullman 2011 Dep. at 15:7-10, 15: 18-20. Police Officer Mitchell ("Officer Mitchell"), who was driving behind Plaintiff at the time, activated his lights and sirens at some point during the drive. Id. at 16:6-8. Despite seeing that the patrol car's lights and sirens were activated, Plaintiff "got nervous" and did not stop. Id. at 16:8-9. Instead, he kept

---

- On July 17, 2007, two unnamed police officers questioned Plaintiff about a child left unattended in a vehicle parked nearby, and then one drew a gun and pointed it at Plaintiff's head, causing dizziness and tightness in Plaintiff's chest, id. at ¶ 28;
- The two officers involved in the July 17, 2007 incident refused to return Plaintiff's driver's license for several days, id. at ¶ 29;
- On May 16, 2008, Defendant Officer Mitchell followed Plaintiff's vehicle, pointed his gun at Plaintiff's head, handcuffed Plaintiff, and placed him in a police van, and then he searched Plaintiff's vehicle, damaging it, id. at ¶¶ 31-33;
- On June 12, 2008, non-defendant Officer Rosado followed Plaintiff's vehicle and issued Plaintiff a careless driving citation, which caused Plaintiff's driver's license to be temporarily suspended before the citation was "dropped by the Commonwealth," id. at ¶ 34; and
- On February 16, 2009, an unnamed police lieutenant responded to two teenagers threatening Plaintiff with a gun, but they later suspended the investigation after learning Plaintiff's identity, id. at ¶ 35.

7

driving beyond city limits and into Yeadon, Pennsylvania. Id. at 16:21-23.

Once he caught up to Plaintiff, Officer Mitchell jumped out of his car, moved to the front of Plaintiff's car, and pointed a gun at Plaintiff's car while asking Plaintiff to step out of his car. Id. at 17:11-12. Plaintiff got out of his car on his own volition, at which point he claims that Officer Mitchell "kind of[] manhandled" him by grabbing his arm, "slap[ping] handcuffs on him," and placing him into the patrol car. Id. at 17:17-18, 19:9-15. Plaintiff testified that Officer Mitchell did not hit, strike, or punch him, and he was not thrown to the ground. Id. at 18:23-19:5. After being held in the patrol car briefly, Plaintiff was released and allowed to return to his own car. Id. at 20:24-21:5. He received citations for failure to stop and reckless driving. Id. at 21:6-16.

## C.    April 3, 2008 Incident

The third incident occurred on April 3, 2008.[6] Plaintiff alleges that he was driving on North 51st Street that day when he was pulled over by Police Officer Jared Krzywicki ("Officer Krzywicki") for driving with tinted windows. TAC ¶¶

---

[6]     This is the original set of facts first alleged in Civil Action No. 10-1536, which the Court later consolidated with two other actions. See Order dated June 11, 2014, ECF No. 48.

8

37-38; Fullman 2011 Dep. at 50:23-51:6. Plaintiff then argued with Officer Krzywicki over whether his window tinting was within the legal limits. Fullman 2011 Dep. at 52:1-6.

After Plaintiff called 911 requesting the presence of a police supervisor, Police Lieutenant Stephen Cassidy ("Lieutenant Cassidy"), whom Plaintiff claims was familiar with Plaintiff and his complaints to the Internal Affairs Division, responded by reporting to the scene. TAC ¶ 39. At some point, Police Officer Rasheen Dickerson ("Officer Dickerson") also arrived at the scene. See id. at ¶ 40. When Plaintiff stepped out of his car, Officer Dickerson "punched [him] in [his] chest and the impact threw [him] back into the car and [he] banged [his] shoulder up against the door frame."[7] Fullman 2011 Dep. at 52:17-21; see also id. at 53:2-11. Because of his shoulder injury, Plaintiff asked the officers if he could go to the hospital, but they denied his request. Id. at 53:10-13. Plaintiff was issued a citation for tinted windows and released. Id. at 53:14-20.

Plaintiff then drove himself to Mercy Hospital, where he was diagnosed with a chest contusion and given a prescription for Motrin. See Pl.'s Resp. Ex. 8, at 2-3, ECF No. 81-10. Plaintiff followed up with his primary care physician several

---

[7]     Plaintiff does not claim that any of the other officers used excessive force toward him during this traffic stop. Fullman 2011 Dep. at 54:1-2.

weeks later, in late May 2008, because he continued to experience left shoulder pain. See id. at 8. The doctor ordered x-rays of Plaintiff's shoulder and referred him to physical therapy. Id. at 10. X-rays showed no fracture or dislocation of the shoulder. Id. at 12. Plaintiff alleges that he received physical therapy two times per week for several months thereafter. Fullman 2011 Dep. at 62:17-63:1.

In connection with this incident, Plaintiff filed an Internal Affairs complaint against Officer Dickerson, Lieutenant Cassidy, and Officer Krzywicki on April 3, 2008. See Letter from Anthony P. DiLacqua, Oct. 30, 2008, Pl.'s Resp. Ex. 11, ECF No. 81-13. The Internal Affairs Division exonerated all three officers on October 30, 2008, on the basis that "[w]ithout [Plaintiff's] cooperation, a thorough investigation could not prove [his] complaints," and there was "no evidence to support [Plaintiff's] claim." Id.

### D.   Pattern of Discrimination and Harassment

In connection with all of the foregoing allegations, Plaintiff claims that the police have been harassing him because (1) his car has tinted windows; (2) he drives a Buick LeSabre; and (3) his car has handicapped tags. Fullman 2011 Dep. at 31:8-20.

10

First, Plaintiff believes he is being harassed due to his tinted windows because "every time I get pulled over it's something about the windows." Id. at 31:23-24. He alleges that he had the windows "checked with the state troopers and they said the windows are completely legal." Id. at 32:5-7. Nevertheless, Philadelphia police officers have "sometimes" given him tickets for the tinting. Id. at 32:14-16.

Second, Plaintiff alleges that he is harassed by Philadelphia police for driving a Buick because the car is "associated with young, Black males . . . [a]nd crime." Id. at 33:2-7. He supports this proposition by explaining that he has seen "a lot of Buicks pulled over," some of which have tinted windows and some of which do not. Id. at 33:8-14. Plaintiff admits, however, that officers have never referenced the type of car he is driving after stopping him. Id. at 33:24-34:5.

Finally, Plaintiff believes he is being harassed due to the handicap tags because officers can see the tags when they pull up behind him and "[b]ecause a lot of handicapped people are targeted." Id. at 34:17-19, 35:16-19.

As evidence of this pattern of harassment, Plaintiff points to a December 7, 2006 letter from Lieutenant John Echols of the Internal Affairs Division requesting an interview with Plaintiff and stating as follows:

11

Mr. Fullman, the police department takes all complaints against their employees very seriously, and due to your ten prior complaints, in which the officers have been exonerated [of] any wrong-doing, except for the two current investigations in our possession right now[,] I feel there must be an underlying reason for this apparent harassment. It is my intention to uncover that underlying reason and correct it.

Pl.'s Resp. Ex. 3, ECF No. 81-5.

Based on the above, Plaintiff brings claims under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981, 1983, and 12188. He brings the following six specific counts against all remaining Defendants in this case[8]:

| | |
|---|---|
| COUNT I | Personal injury/excessive use of force, see TAC ¶¶ 44-50;[9] |
| COUNT II | Property damages, see id. at ¶¶ 51-57; |
| COUNT III | Denial of due process, see id. at ¶¶ 58-66; |
| COUNT IV | Denial of equal protection, see id. at ¶¶ 67-73; |
| COUNT V | Discrimination, in violation of the Americans with Disabilities Act ("ADA"), see id. at ¶¶ 74-80; and |

---

[8]     Each count additionally names Police Officer Rosado ("Officer Rosado")--but he is no longer a Defendant in this case. See infra 16 n.13.

[9]     Throughout this litigation, the Court has construed Plaintiff's "personal injury" claim as a claim for excessive force in violation of the Fourth Amendment of the United States Constitution.

COUNT VI          Harassment   and   retaliation,   see
                  id. at ¶¶ 81-82.

Plaintiff requests damages in excess of $500,000, comprising

punitive damages, property damages, costs, attorney's fees,

interest, and damages for pain and suffering. Id. at 23-24.

## II.  **PROCEDURAL HISTORY**

The currently operative complaint in this action

consolidates Plaintiff's claims from three separate actions:

Nos. 08-2781, 09-3559, and 10-1536.

On June 20, 2008, Plaintiff, proceeding pro se, filed

Civil Action No. 08-2781 against the City, the Philadelphia

Police Department, and Officer Lynch. Dkt. No. 08-2781, ECF No.

3. On September 24, 2008, the City of Philadelphia and Officer

Lynch filed an Answer to Plaintiff's Complaint. Dkt. No. 08-

2781, ECF No. 8. On April 13, 2009, the City of Philadelphia and

Officer Lynch filed a motion for summary judgment. Dkt. No. 08-

2781, ECF No. 19. The case was placed in suspense on June 22,

2009, "due to Plaintiff's serious side effects and complications

from his medications which [were] causing confusion and changes

in his behavior." Dkt. No. 08-2781, ECF No. 26 (internal

quotation marks omitted).

On November 30, 2009, Plaintiff filed a complaint in

Civil Action No. 09-3559 against the City, the Philadelphia

Police Department, the Philadelphia Internal Affairs Division,

13

Officers Williams, Perkins, Martex, Mitchell, Rosado, and McMichael, and John Does 1-5. Dkt. No. 09-3559, ECF No. 5. Some time on or after January 22, 2010, service was accepted on behalf of the City and Officer McMichael only. See Dkt. No. 09-3559, ECF No. 6. On February 18, 2010, the City and Officer McMichael filed an answer to Plaintiff's complaint, Dkt. No. 09-3559, ECF No. 8, and on February 24, 2010, the City and Officer McMichael filed a partial motion to dismiss, Dkt. No. 09-3559, ECF No. 9. On March 15, 2010, Plaintiff filed a partial response to Defendants' motion to dismiss. Dkt. No. 09-3559, ECF No. 10. Following a hearing, all claims against Williams, Perkins, Martex, and McMichael were dismissed as time-barred,[10] and the case was placed in suspense as of April 27, 2010, "at Plaintiff's request, due to his mental health condition and side effects from his medication." Dkt. No. 09-3559, ECF No. 16.

On April 5, 2010, Plaintiff commenced Civil Action No. 10-1536, ECF No. 73,[11] but just over three weeks later, on April 27, 2010, the Court placed the case in civil suspense, again at Plaintiff's request and "due to his mental health condition and side effects from his medication," ECF No. 2.

_____

[10]     This left only the claims in paragraphs 16-23 of the 2009 Complaint, which were allegations against Officers Mitchell and Rosado.

[11]     Henceforth, all electronic filing ("ECF") references are to the docket in Civil Action No. 10-1536.

14

On November 22, 2010, the Court ordered that Civil Action Nos. 10-1536, 08-2781, and 09-3559 be removed from civil suspense and returned to the active docket. ECF No. 5. The Court further ordered that Civil Action Nos. 08-2781 and 09-3559 be marked closed and consolidated with Civil Action No. 10-1536. Id. The Court denied Plaintiff's motion to appoint counsel without prejudice on February 10, 2011, on the basis that the Court could not determine at that stage whether Plaintiff's claims had any legal merit.[12] ECF No. 10.

On June 22, 2011, pursuant to a scheduling order dated May 24, 2011, Plaintiff was deposed. At the deposition, Plaintiff hand-delivered an amended complaint dated April 5, 2010, to Defendants' counsel. See ECF No. 69 ¶ 4 & n.1. On July 8, 2011, the City and Officers Dickerson and Cassidy filed an answer to this amended complaint. ECF No. 18. The amended complaint was not filed with the Court, however, until August 25, 2011. ECF No. 31.

Thereafter, the case was placed in suspense for a period of time due to Plaintiff's health conditions. ECF No. 36. Plaintiff later obtained counsel, Steward C. Crawford, Jr.,

---

[12]     Pursuant to Tabron v. Grace, 6 F.3d 147 (3d Cir. 1993), a district court considering a motion to appoint counsel must determine as a threshold matter whether "the plaintiff's claim has arguable merit in fact and law." Id. at 155.

Esquire, who entered his appearance on November 6, 2013. ECF No. 44.

After a status and scheduling conference held on June 10, 2014, the Court removed the case from suspense and granted Plaintiff leave to file an amended complaint by July 10, 2014. ECF No. 48. The Court ordered that "[t]he claims set forth in the amended complaint [would] relate back, respectively, to the filing of the original complaint in each case from which the claim was first asserted" and reminded the parties that "[o]nly the claims asserted against the parties named in Civil Numbers 08-2781, 09-3559, and 10-1536 are consolidated in this case." Id. at 2 & n.2.

On August 13, 2014, through counsel, Plaintiff filed an amended consolidated complaint naming as Defendants the City, Officers Dickerson, Cassidy, Krzywicki, Lynch, and Mitchell, and a single John Doe.[13] ECF No. 51. Defendants filed an answer on

---

[13]     This amended complaint, unlike Plaintiff's prior complaints, did not name as Defendants the Philadelphia Police Department or Internal Affairs Division, nor did it name Police Officers McMichael, Perkins, Rosado, Williams, or Martex. Further, there is no evidence that summonses were ever issued to these entities or individuals, and the City Solicitor's Office did not file an answer to the amended complaint on behalf of any of them. Accordingly, all of these entities and individuals were terminated from this action on August 13, 2014.

September 17, 2014, ECF No. 52, and then amended that answer on December 16, 2014, ECF No. 54.[14]

The Court thereafter granted several extensions of the discovery period. On December 16, 2015, the Court issued a fourth scheduling order, in which it directed the parties to complete discovery by January 15, 2016, fully brief any motions for summary judgment by February 29, 2016, and attend a status and scheduling conference on April 18, 2016. ECF No. 67.

On February 12, 2016, Defendants moved for summary judgment. ECF No. 70. Plaintiff filed his response on March 1, 2016. ECF No. 72. On April 18, 2016, following a status and scheduling conference, the Court entered a fifth scheduling order granting Plaintiff leave to file a third amended complaint on or before April 28, 2016. ECF No. 74. In this order, the Court specifically instructed Plaintiff to "identify, as to each count in the Third Amended Complaint, the theory of liability, the defendants against whom that theory is asserted, and the facts which support that theory." Id. ¶ 1.

On April 28, 2016, Plaintiff filed his third amended complaint.[15] ECF No. 77. On May 16, 2016, the Court ordered

---

[14]     This amended answer is very nearly identical to the initial answer; the only change is the inclusion of all named Defendants.

[15]     The Court's orders generally refer to this document as a "third amended complaint," see, e.g., ECF No. 74, while the

Defendants to file a renewed motion for summary judgment on or before May 31, 2016. ECF No. 78. On May 18, 2016, Defendants filed an answer to Plaintiff's third amended complaint, ECF No. 79, and on May 31, 2016, Defendants filed a renewed motion for summary judgment, ECF No. 80. On June 13, 2016, Plaintiff filed a response to Defendants' latest motion for summary judgment. ECF No. 81. The motion is now ripe for disposition.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence

---

parties' filings refer to it as a "second amended consolidated complaint," see, e.g., ECF Nos. 77, 79. For the sake of simplicity, the Court refers to it in this memorandum as a "third amended complaint" using the following logic: Plaintiff filed his original complaint pro se on April 5, 2010 (ECF No. 73), an amended complaint pro se on August 25, 2011 (ECF No. 31), a second amended complaint through counsel on August 13, 2014 (ECF No. 51), and a third amended complaint through counsel on April 28, 2016 (ECF No. 77).

might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). The moving party bears the initial burden to show the absence of a genuine issue of material fact. Anderson, 477 U.S. at 250. Once the moving party meets this obligation, however, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Id.

## B.    Claims Against the City of Philadelphia

Defendants first argue that the Court should dismiss all claims against the City because Plaintiff has not established that his alleged injuries stemmed from any municipal policy or custom. See Defs.' Renewed Mot. Summ. J., ECF No. 80, at 7-9 [hereinafter Defs.' Mot.].

Municipalities may be held liable under § 1983 if "action pursuant to official municipal policy of some nature

19

cause[s] a constitutional tort." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Generally, municipal liability arises where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. at 690. Municipalities can also face liability under § 1983 "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690-91. A "custom" arises from practices that amount to entrenched behavior by the municipal employees. Id. at 691.

Under the framework outlined in Monell, a plaintiff bringing a claim against a municipality under § 1983 must establish that (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the "moving force" behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom. Id. at 692-94. "[A] municipality cannot be held liable solely because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691.

As a threshold matter, and regardless of whether the plaintiff proceeds on the basis of policy or custom, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990)). An official is a policymaker if, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question. Hill v. Borough of Kutztown, 455 F.3d 225, 245-46 (3d Cir. 2006). The official's authority to make the policy must be "final and unreviewable," id. at 245, because "[u]nder § 1983, only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality," Bielevicz, 915 F.2d at 850.

"There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003). First, a policy or custom may be inferred from the acts or omissions of an officer-employee where "the appropriate officer or entity promulgates a generally applicable statement of policy and the

subsequent act complained of is simply an implementation of that policy." Id. at 584 (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 417 (1997) (Souter, J., dissenting)).

Second, a policy or custom may be inferred where "no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself." Id. at 584 (quoting Bryan Cty., 520 U.S. at 417-18 (Souter, J., dissenting)). "In this situation, the choice of policy and its implementation are one, and the first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting." Bryan Cty., 520 U.S. at 418 (Souter, J., dissenting).

Third, a policy or custom may be inferred where "the policymaker has failed to act affirmatively at all," but "the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Natale, 318 F.3d at 584 (quoting Bryan Cty., 520 U.S. at 417-18 (Souter, J., dissenting)).

Here, Defendants argue that "[t]he Court should dismiss all of Plaintiff's claims against the City because Plaintiff has neither averred, nor produced evidence of, any municipal policy or custom or any policymaker responsible for

his alleged harms." Defs.' Mot. at 7. They argue further that, "to the extent Plaintiff attempts to state a failure-to-train claim, such claim fails because Plaintiff has neither alleged nor produced evidence of prior instances of police misconduct caused by allegedly inadequate training." Id. at 9.

Plaintiff responds that Defendants "overlook[] the simple fact that this is not a pure civil rights case, it is also a personal injury claim directed against individual officers in relation to excessive use of force at one or more of the incidents." Pl.'s Resp. at 7, ECF No. 81-1. Referring to the December 7, 2006, letter from Lieutenant John Echols of the Internal Affairs Division, Plaintiff argues further that Defendants "overlook[] the fact of [their] own . . . acknowledgement of a pattern of harassment" that "alone satisfies the Monell requirements in that a decision maker (i.e. the [I]nternal [A]ffairs [D]ivision) promised to correct the abuses; however, no action seems to have been taken since the harassment escalated." Id.

The closest Plaintiff comes to alleging a policy or custom under Monell is alleging a "pattern of harassment" and "pattern of hostility" including "false arrests, brutality, unmerited citations, and racial profiling." TAC ¶ 60. These conclusory allegations, without more, are insufficient to plead a policy or custom under Monell. Plaintiff's sole basis for his

23

contention that the stops are actually motivated by his disability is that "a lot of handicapped people are targeted." Fullman 2011 Dep. at 35:16-19. This is not evidence tending to prove the existence of a policy or custom that fits the Monell standard, nor is it evidence identifying a policymaker who was responsible for his alleged harms.

Similarly, Plaintiff's argument based on the December 7, 2006, letter from Lieutenant John Echols of the Internal Affairs Division fails to make out a policy or custom under Monell. The content of the letter is not, as Plaintiff claims, an "acknowledgment" of a pattern of harassment, let alone one that satisfies the Monell standard. The letter states that the officers named in Plaintiff's ten prior Internal Affairs complaints were exonerated, and it leaves opens the possibility that the officers very well may have been behaving reasonably under the circumstances of each alleged incident. See Pl.'s Resp. at 8 (quoting Ltr. from Lt. Echols, 12/7/2006, ECF No. 81-5). Moreover, the content of the letter is somewhat ambiguous in that it could be interpreted to mean that Plaintiff is harassing the police department, rather than the other way around. In any case, the letter certainly does not suggest that the "apparent

harassment" of Plaintiff is a result of any municipal policy or custom.[16]

Finally, the Court notes that Pennsylvania law provides that "[n]o person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." 75 Pa. Cons. Stat. § 4524(e)(1). Given that police officers are authorized to enforce Pennsylvania's motor vehicle code, it is difficult to imagine that any "custom" or "policy" of stopping Plaintiff for tinted windows could be considered unconstitutional.[17]

Though Plaintiff may be correct that "tort immunity extends only to negligent acts" and does "not protect 'crime, actual fraud, actual malice or willful misconduct,'" Pl.'s Resp. at 9 (quoting 42 Pa. Cons. Stat. Ann. § 8542), Monell makes clear that a respondeat superior theory is unavailable to establish § 1983 liability, see Monell, 436 U.S. at 691--and

---

[16]     Though perhaps not grounds for dismissing Plaintiff's harassment and discrimination claims, the Court notes in passing that the letter dates back to 2006 and thus does not concern the timeframe relevant to most of the incidents at issue in this litigation.

[17]     Plaintiff contends that the percentage of window tinting on his vehicle is legal, but he does not dispute that his windows are tinted. See TAC ¶ 36.

25

therefore, whether the individual officers might be protected by qualified immunity is a separate and distinct question that does not bear on the Court's treatment of Plaintiff's claims against the City.[18]

For these reasons, the Court will grant Defendants' motion for summary judgment as to all of Plaintiff's claims against the City of Philadelphia.

C.    Due Process Claims

In Count III of his third amended complaint, Plaintiff alleges denial of due process "in violation of 42 U.S.C. § 1983 and the U.S. and State Constitutions, including the common law." TAC ¶ 66.

At the outset, Defendants are correct that the Court "need not consider the allegations . . . [that] do not refer to any named Defendants in this action." Def.'s Mot. at 9 n.4.

---

[18]    Defendants argue in their motion that qualified immunity protects the police officer Defendants in this case because "a reasonable officer in Defendants' position would not believe that any of the conduct at issue in this case was a clear violation of Plaintiff's rights," Defs.' Mot. at 21, and "[q]ualified immunity shields officers from liability unless a 'firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right.'" Defs.' Mot. at 20 (quoting Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 639 (3d Cir. 2015)). Because the Court ultimately concludes that all of Plaintiff's claims against all Defendants must be dismissed on various other grounds, it need not decide whether any individual Defendant here might be shielded by qualified immunity.

Further, Defendants are correct that the portions of Plaintiff's third amended complaint appearing to allege due process claims against the City "need not be considered because Plaintiff has failed to state a <u>Monell</u> claim." <u>Id.</u>

As to Plaintiff's claims regarding named individual Defendants, Defendants argue that "Plaintiff has not created a genuine issue of material fact as to any Defendant's liability for due process violations" because "[c]laims for these alleged violations sound in the Fourth, rather than Fourteenth, Amendment." Defs.' Mot. at 9-10. Defendants point out that "[t]he conduct alleged in each of these [claims] involves a 'seizure' of Plaintiff's person, which directly implicates the Fourth Amendment." <u>Id.</u> at 10. Defendants also argue that Plaintiff's allegation regarding Lieutenant Cassidy's suspension of a search for a firearm belonging to two teenagers who had allegedly threatened Plaintiff, <u>see</u> TAC at ¶ 64, is not a cognizable due process claim. <u>Id.</u> at 10-11.

Plaintiff does not directly address Defendants' Fourth Amendment argument in his response. Instead, he merely reiterates his claim that "[t]he injury, arrest, and frivolous subjection to Court process all of which were known by the officer to be wrongful (as evidenced by his failure to prosecute) violate [Plaintiff's] Due Process Rights." Pl.'s Resp. at 10.

27

The Court agrees with Defendants that Plaintiff's claims, though couched in terms of due process, are actually challenges to various incidents involving alleged Fourth Amendment violations. See, e.g., TAC at ¶ 59 (describing "arrest [that] lacked merit as evidenced by the election not to prosecute and subsequent dismissal"); ¶ 62 (describing incident in which Plaintiff "was placed in a police vehicle (handcuffed) and . . . had a gun pointed at him"); ¶ 65 (describing incident in which Plaintiff "was wrongfully detained and subsequently injured after having been tricked into exiting his vehicle"). Regarding Lieutenant Cassidy's alleged suspension of Plaintiff's requested search, Plaintiff does not provide and the Court has not identified any legal basis for imposing due process liability for failure to investigate a complaint filed with the police.[19]

---

[19]     Courts within the Third Circuit have held that a plaintiff may establish a due process violation for failure to investigate by showing that the defendant "'acted intentionally or recklessly' in a manner that shocks the conscience." Briscoe v. Jackson, 2 F. Supp. 3d 635, 644 (E.D. Pa. 2014) (quoting Martin v. Anderson, No. 07-2965, 2008 WL 4761734, at *9 n.8 (E.D. Pa. Oct. 29, 2008)). These cases typically pertain to plaintiffs' claims that the police failed to adequately investigate claims against the plaintiffs themselves (on the basis that adequate investigation may, for example, have uncovered exculpatory evidence). See, e.g., Retzler v. Marrone, No. 08-5191, 2009 WL 2412690, at *4 & n.2 (E.D. Pa. Aug. 5, 2009) (addressing plaintiff's argument that a police officer "failed to conduct a proper investigation into the charges against him" and citing Martin, 2008 WL 4761734, for the rule that "[a] failure to investigate may support a due process claim

28

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." Albright v. Oliver, 510 U.S. 266, 266 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). Because Plaintiff's "due process" claims are actually Fourth Amendment claims but have never been properly raised as such, the Court will grant Defendants' motion for summary judgment on all of these claims.

D.   Retaliation Claims[20]

Defendants next argue that the Court should dismiss Plaintiff's retaliation claims "because Plaintiff has not

---

if the plaintiff can show the defendant acted intentionally or recklessly, thereby shocking the conscience"). Even if the Court were to apply this rule to Plaintiff's case here, however--where Plaintiff alleges that the police failed to investigate a complaint that Plaintiff filed with the Internal Affairs Division against third parties--Plaintiff's claim would still fail because he has alleged no facts suggesting that Lieutenant Cassidy's alleged suspension of the search was done "intentionally or recklessly in a manner that shocks the conscience."

[20]     Though Count VI brings claims for "Harassment and Retaliation," Pennsylvania law does not provide a cause of action for harassment. See Avery v. Mitchell, No. 98-2487, 1999 WL 240339, at *10 (E.D. Pa. Apr. 20, 1999) ("The tort of harassment is not recognized by Pennsylvania courts because an action for invasion of privacy is ordinarily an adequate remedy for highly offensive conduct which unreasonably interferes with another's right to be left alone." (internal quotation marks omitted)).

created a genuine issue of material fact as to whether he was unlawfully retaliated against by any Defendant." Defs.' Mot. at 11. During his depositions, the only individuals to whom Plaintiff attributed retaliatory conduct were Officers Lynch and Rosado. See Fullman 2008 Dep. at 38:12-24; Fullman 2011 Dep. at 24:10-21. Officer Rosado is no longer part of this case, and Defendants argue that "Plaintiff does not allege or present evidence that [Officer] Lynch was aware of [Plaintiff's] prior complaints, let alone that Lynch's actions were motivated by any such complaints." Defs.' Mot. at 12.

To prevail on a retaliation claim, a plaintiff generally must prove that (1) he engaged in constitutionally-protected activity; (2) the government responded with retaliation; and (3) the protected activity caused the retaliation. Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004).

Here, Defendants argue not only that Plaintiff has presented no evidence that Officer Lynch arrested him on the basis of his prior complaints to the Internal Affairs Division, but also that Officer Lynch had probable cause to arrest Plaintiff because he was parked in the fire lane and then swore at Officer Lynch. See id. at 11-12. Indeed, Plaintiff admits that Officer Lynch arrested him for disorderly conduct and gave him a ticket for parking in the fire lane--both of which are

30

violations of law. Fullman 2008 Dep. Tr. at 11:1. Plaintiff also admits that he began arguing with Officer Lynch when he felt that Officer Lynch was not properly addressing other illegally parked vehicles, id. at 13:6-9, and he admits to walking away from Officer Lynch and then sitting in his car, which remained illegally parked in the fire lane, id. at 14:1-15:10.

In addition, Defendants argue that Plaintiff has not pointed to any evidence supporting his conclusory pleading that Officer Lynch's actions were a response to Plaintiff's history of filing Internal Affairs complaints against various Philadelphia police officers. See Defs.' Mot. at 11. When asked to explain what he believed motivated Officer Lynch's actions during the incident in question, Plaintiff simply stated that his handicapped tags were visible, Fullman 2008 Dep. at 38:12-20, and that he believed his status as an African American driving a Buick with tinted windows motivated the officer's actions, id. at 38:20-24. This evidence does not support a causal link between Officer Lynch's actions and Plaintiff's history of filing Internal Affairs complaints against other officers in the Philadelphia Police Department.

For these reasons, the Court will grant Defendants' motion for summary judgment on Plaintiff's retaliation claims.

E.    Equal Protection Claim

Defendants next argue that Plaintiff's equal protection claim fails "for lack of evidence with respect to all Defendants." Defs.' Mot. at 13. The Court agrees.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This Amendment requires state actors to treat all "similarly situated" persons alike. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

In support of his equal protection claim, Plaintiff alleges that he "[e]ssentially . . . is not guaranteed the right to stand on a sidewalk peaceably," TAC ¶ 70, "[e]ssentially . . . is not provided [the] right to report police misconduct as he sees fit," id. ¶ 71, and "[e]ssentially . . . is not afforded the right under the law to operate a vehicle peaceably," id. ¶ 72. His equal protection allegations also include the following:

> [He] was chased out of Philadelphia and into Yeadon, he was falsely arrested, he was placed in imminent fear of lethal harm when firearms were pointed at his head on more than one occasion, he was emotionally distressed, he was denied medical treatment, he was discriminated against, he was prevented from parking in a handicapped space, he was issued false citations causing his license to be suspended, he was issued false citations and subject to arrest for false claims of illegal window tinting, he was prevented from using

32

handicapped parking spaces, [and] he was questioned about the existence of a known disability.

Id. ¶ 73.

From these allegations, it is difficult to discern the theory of Plaintiff's equal protection claim. One possible theory might be selective prosecution, which is a form of discriminatory law enforcement that has been held to violate the Equal Protection Clause of the Fourteenth Amendment since Yick Wo v. Hopkins, 118 U.S. 356 (1886). In Yick Wo, officials were held liable for "illegal discrimination" when they "applied and administered" a facially neutral law "with an evil eye and an unequal hand." Id. at 373-74. To make out this type of equal protection claim, a plaintiff must prove that (1) that persons similarly situated were not prosecuted, and (2) the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or "some other arbitrary factor." United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir. 1989) (per curiam). More specifically, in the racial profiling or disability discrimination context, a plaintiff is required to prove that the actions of officials "(1) had a discriminatory effect, and (2) were motivated by a discriminatory purpose." Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).

As Defendants argue in their motion, Plaintiff provides no evidence that any individual Defendant's conduct was

motivated by Plaintiff's race or disability or any other "arbitrary factor." Schoolcraft, 879 F.2d at 68. Though Plaintiff is African American and thus a member of a protected class, he has failed to allege that any similarly situated person has been treated differently than he has; Plaintiff claims only that "[f]ailing to act in a meaningful manner on [Plaintiff]'s [complaints] denies him equal protection under the law when (it is presumed) [the police] would act on the complaints of other persons." TAC ¶ 69 (emphasis added). To successfully make out an equal protection claim, Plaintiff would need to show, for example, that other individuals with the same percentage of car-window tinting were not stopped and issued citations, or that other individuals who argued with and swore at police officers were not arrested. Mere speculation that other complaints might be handled differently does not constitute evidence.

Although Plaintiff cites his handicapped tags and type of vehicle as the motivating forces behind his traffic stops, he admits that he has tinted windows and acknowledges that the officers cited the tinting as the reason for the stop. Fullman 2011 Dep. at 31:21-32:3. The Court agrees with Defendants that, without any supporting evidence, "Plaintiff's personal belief that black males are typically associated with Buick LeSabres does not create an issue of material fact as to whether these

34

Defendants pulled him over for a discriminatory purpose." Defs.'
Mot. at 14.

Because Plaintiff has failed to provide any evidence
showing that Defendants' actions had a discriminatory effect or
were motivated by a discriminatory purpose, the Court will grant
Defendants' motion for summary judgment on Plaintiff's equal
protection claims against all Defendants.

F.   ADA Claims

Defendants next argue that Plaintiff's ADA claims must
fail because "Plaintiff has neither alleged, nor proffered
evidence, that he was wrongly arrested because of his disability
or that he was harmed by any failure to accommodate his
disability." Defs.' Mot. at 15. Again, the Court agrees.

Defendants concede that municipalities may be held
liable for violations of the ADA during arrests,[21] and further

---

[21]     The Court notes briefly its disagreement with
Defendants' contention that "[a]s an initial matter, the ADA
does not give rise to individual liability." Defs.' Mot. at 15
(citing Morais v. City of Philadelphia, No. 06-582, 2007 WL
853811, at *11 (E.D. Pa. Mar. 19, 2007)). Though this might
fairly characterize the consensus view of courts within this
Circuit, see McInerney v. Moyer Lumber & Hardware, Inc., 244 F.
Supp. 2d 393, 398 (E.D. Pa. 2002) (collecting cases showing that
"a growing number of district courts in this Circuit have
concluded that there is no individual liability under the ADA"),
the Supreme Court has not definitively decided this issue, and
the Third Circuit has noted only in dicta that "there appears to
be no individual liability for damages under Title I of the
ADA." Koslow v. Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002).
Regardless of whether the ADA provides for individual liability,

35

that there are two theories of liability for such claims.[22] See
Defs.' Mot. at 15. The "wrongful arrest" theory applies when
police arrest an individual with a disability because the police
misperceived the effects of his or her disability as criminal
activity. See Morais v. City of Phila., No. 06-582, 2007 WL
853811, at *11 (E.D. Pa. Mar. 19, 2007). To prevail on such a
claim, a plaintiff must show that (1) he was disabled; (2) the
arresting officer knew or should have known of his disability;
and (3) the officers arrested him because they mistakenly
confused his disability with illegal conduct. See id. The second
possible theory of liability under the ADA is the "reasonable
accommodation" theory, which applies when the police properly
investigate and arrest a person with a disability for a crime
unrelated to his disability, but then fail to reasonably
accommodate the person's disability in the course of the
investigation or arrest, thereby "causing the person to suffer
greater injury or indignity in that process than other

---

however, Plaintiff's claims here fail because he has not alleged
that he was falsely arrested because of his disability or harmed
by any failure to accommodate his disability.

[22]     Courts within the Third Circuit have explained that
"[t]hose Circuit courts that have addressed the question [of]
the applicability of the ADA to arrests have identified two
theoretical bases for these claims." Morais, 2007 WL 853811, at
*11 (citing Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir.
1999)).

arrestees." See id. (quoting Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir. 1999)).

Here, Plaintiff's attempt to state a claim fails under either theory because he has not alleged nor produced evidence that he was arrested by an officer who mistakenly believed that symptoms of his disability were illegal activity, nor does he allege or produce any evidence that he requested any accommodation for his disability that was not provided during any of his interactions with the police.[23] For these reasons, the Court will grant Defendants' motion for summary judgment on Plaintiff's ADA claims.

### G.   Statute of Limitations

Defendants contend that Plaintiff's claims against Officer Dickerson, Lieutenant Cassidy, and Officer Krzywicki, all of which stem from his April 3, 2008, arrest, are barred by the statute of limitations. Defs.' Mot. at 16-17.

"Because there is no federal statute of limitations with respect to civil rights actions arising under section 1983, the relevant state's statute of limitations for analogous

---

[23]     Although Plaintiff complained during one of his depositions that he was mocked by an unnamed police officer for his diabetes during the course of his June 13, 2006, arrest, see Fullman 2008 Dep. Tr. at 19:16-20:2, that officer is not a named Defendant in this case. Moreover, an unsupported allegation that an unnamed officer mocked him for his disability does not by itself make out a claim under either the wrongful arrest or reasonable accommodation theories of liability under the ADA.

actions applies." Johnson v. Whitaker, No. 14-1780, 2014 WL
6825543, at *2 (E.D. Pa. Dec. 4, 2014) (citing Dique v. New
Jersey State Police, 603 F.3d 181, 185 (3d Cir. 2010)). In
Pennsylvania, that period is two years. See id. Because a claim
generally accrues "when the plaintiff discovers, or with due
diligence should have discovered, the injury that forms the
basis for the claim," Romero v. Allstate Corp., 404 F.3d 212,
222 (3d Cir. 2005), courts have held, in the context of a § 1983
claim arising from an arrest, that a plaintiff typically has
reason to know of the injury on the date of the arrest. See,
e.g., Jackson v. Nicoletti, 875 F. Supp. 1107, 1109 (E.D. Pa.
1994); Pendergrass v. Gray, No. 06-2247, 2006 WL 3165007, at *2
(E.D. Pa. Oct. 30, 2006).

Here, Plaintiff did not bring any claims against
Officer Dickerson, Lieutenant Cassidy, or Officer Krzywicki
until he hand-delivered his first amended complaint to
Defendants' counsel at his deposition on June 22, 2011, see
Fullman 2011 Dep. Tr. 50:6-16, which was more than three years
after the April 3, 2008, incident in question. Plaintiff then
waited until August 25, 2011, to file his first amended
complaint with the Court. See ECF No. 31.

In his response to Defendants' motion, Plaintiff
argues that Defendants were on notice of Plaintiff's claims
stemming from the April 3, 2008, incident as soon as Plaintiff

filed a complaint with the Internal Affairs Division on April 3, 2008.[24] Pl.'s Resp. at 12.  Plaintiff, however, does not point to authority suggesting that filing a complaint with Internal Affairs excuses a plaintiff from filing a lawsuit within the limitations period.[25] Plaintiff also asks this Court to allow his claims to "relate back to the filing on April 10, 2010 Federal Court Complaint," [26] id., which the Court construes to mean Plaintiff's original complaint in Civil Action No. 10-1536, filed on April 5, 2010. See ECF No. 73. Even April 5, 2010, however, is more than two years after April 3, 2008, and thus Plaintiff's claims are barred by the statute of limitations even

---

[24]     Plaintiff's response uses both April 3, 2008, and April 8, 2008, as the date of the incident involving Officer Dickerson, Lieutenant Cassidy, or Officer Krzywicki. Compare Pl.'s Resp. at 6 with Pl.'s Resp. at 11. Because Plaintiff's Internal Affairs complaint reporting this incident states that it occurred on April 3, 2008--and, moreover, because this Internal Affairs complaint itself is dated April 3, 2008--the Court finds that the incident occurred on April 3, 2008, and calculates the statute of limitations accordingly. See Pl.'s Resp Ex. 7, ECF No. 81-9.

[25]     Federal Rule of Civil Procedure 3 states clearly that "[a] civil action is commenced by filing a complaint with the court."

[26]     Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading . . . ."

if the Court uses the earliest possible filing date in this case
as the operative date for calculating the limitations period.[27]

Because Plaintiff's claims against Officer Dickerson,
Lieutenant Cassidy, and Officer Krzywicki fall outside of the
statute of limitations, the Court will grant Defendants' motion
for summary judgment on these claims.

H.    Excessive Force Claims

Finally, Defendants argue that Plaintiff's excessive
force claims fail because "Plaintiff has offered insufficient
evidence to proceed on his excessive force claims against
Officers Mitchell or Lynch." Defs.' Mot. at 18.

A police officer is privileged to commit a battery
pursuant to a lawful arrest, but the privilege is negated by use
of excessive force. Edwards v. City of Phila., 860 F.2d 568, 572
(3d Cir. 1988). A cause of action for excessive force exists
under § 1983 when a law enforcement officer uses force so
excessive that it violates the Fourth and Fourteenth Amendments
to the United States Constitution. Brown v. Borough of
Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990); see also Graham

---

[27]    Although Plaintiff filed his original complaints in
Civil Action Nos. 08-2781 and 09-3559 on June 20, 2008 and
November 30, 2009, respectively, see Dkt. No. 08-2781, ECF No.
3; Dkt. No. 09-3559, ECF No. 5, neither of these complaints
brings claims against Officer Dickerson, Lieutenant Cassidy, or
Officer Krzywicki stemming from Plaintiff's April 3, 2008,
arrest.

v. Connor, 490 U.S. 386, 394-95 (1989) (holding that an
excessive force claim under § 1983 arising out of law
enforcement conduct is based on the Fourth Amendment's
protection from unreasonable seizures of the person).

The force that a police officer uses to effectuate an
arrest must be reasonable. Graham, 490 U.S. at 396. The
reasonableness of an officer's use of force is measured by
"careful attention to the facts and circumstances of each
particular case, including the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of
the officers or others, and whether he is actively resisting
arrest or attempting to evade arrest by flight." Id. The
reasonableness inquiry is objective but should give appropriate
scope to the circumstances of the police action, which are often
"tense, uncertain, and rapidly evolving." Id. at 397.

For excessive force claims, summary judgment is
appropriate if, as a matter of law, the evidence would not
support a reasonable jury finding that the police officers'
actions were objectively unreasonable. Groman v. Twp. of
Manalapan, 47 F.3d 628, 633-34 (3d Cir. 1995).

Plaintiff alleges that Officer Mitchell attempted to
pull over Plaintiff's car by activating the lights and sirens of
his patrol car, Fullman 2011 Dep. at 16:6-9, and he admits that
he did not stop and instead led Officer Mitchell on a chase

41

beyond city limits and into Yeadon, id. at 16:10-23. After the
chase ended, Officer Mitchell approached Plaintiff's car with
his gun pointed toward the front of the car. Id. at 17:5-12.
Plaintiff then exited his vehicle voluntarily. Id. at 19:6-8. He
does not allege that Officer Mitchell continued to point the gun
at him after he exited the car, nor does he allege that he was
punched, struck, or otherwise thrown to the ground by Officer
Mitchell. See id. at 18:23-19:5. Instead, Plaintiff alleges only
that he was handcuffed, briefly held in a patrol car, and
ultimately released with traffic citations for failure to stop
and reckless driving. Id. at 21:6-13.

        Further, Plaintiff alleges that Officer Lynch pulled
him out of his car while he was parked in the fire lane, twisted
his thumb to get him into handcuffs, and kicked his legs open to
frisk him. Fullman 2008 Dep. at 17:4-15, 24:2-4. Plaintiff
claims that he "sought immediate medical treatment for a
sprained thumb evidencing the existence of an injury." Pl.'s
Resp. at 9.

        Defendants argue that, even accepting all of
Plaintiff's allegations as true, all of the force used by both
Officers Mitchell and Lynch was directly related to the
effectuation of Plaintiff's arrests during these respective
incidents. Defs.' Mot. at 19-20. Defendants contend that
"Officer Mitchell did not use excessive force but rather used

                              42

the necessary precautions to effectuate the stop and detention of a person who refused to submit to a traffic stop and took a police officer on a chase into another county," id. at 20, and similarly that "all of the force utilized by [Officer] Lynch was directly related to Lynch's attempt to effectuate Plaintiff's lawful arrest during an incident in which Plaintiff admits to illegally parking in a fire lane and swearing at the officer," id.

Plaintiff responds that "[t]he unholstering of deadly weapons during the conversation . . . was objectively unreasonable" because "the circumstances of his apprehension fell outside of the scope of when deadly force is permitted." Pl.'s Resp. at 10. Indeed, Plaintiff's third amended complaint mentions either the threat or use of "deadly force" at least three separate times in his claims alleging excessive use of force. See TAC ¶¶ 46, 47. Plaintiff points to no law, however, supporting his implied assertion that wielding a gun constitutes "deadly use of force" or even the threat thereof.

Because Plaintiff has failed to adduce any evidence supporting his claims that the force Officers Mitchell and Lynch used against him was excessive, the Court will grant summary judgment on these claims.

43

## II. CONCLUSION

In summary, Plaintiff has not shown that there is a genuine dispute as to any material fact that would bear upon the resolution of any of his six claims against the remaining Defendants in this case. The case is now over six years old, and Plaintiff, who has had counsel since 2013, has had two separate opportunities to file amended complaints. Because all Defendants are entitled to judgment as a matter of law on all six of Plaintiff's claims, the Court will grant Defendants' motion for summary judgment in full.

An appropriate order follows, and judgment shall be entered in favor of Defendants.